Carlos Ovidio
**PLATERO–CORTEZ, Petitioner,**

v.

**IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

No. 85–7512.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 14, 1986.

Decided Nov. 24, 1986.

James R. Mayock, San Francisco, Cal., for petitioner.

Eloise Rosas, Dept. of Justice, Washington, D.C., for respondent.

Before KENNEDY, REINHARDT and BRUNETTI, Circuit Judges.

BRUNETTI, Circuit Judge.

Petitioner Carlos Ovidio Platero-Cortez (Platero-Cortez) entered the United States without inspection. He applied for political asylum, prohibition against deportation, and voluntary departure. The Immigration Judge (IJ) denied his application; the Board of Immigration Appeals (BIA) dismissed his appeal. On petition for review, Platero-Cortez contends that: (1) the BIA applied an incorrect legal standard to his application; (2) substantial evidence supported his application; and (3) he was denied due process. We find that the BIA's decision is unsupported by substantial evidence. Platero-Cortez meets both the clear probability and the well-founded fear standards. He should not be deported and is eligible for asylum.

## I.
### FACTS AND PROCEEDINGS BELOW

Platero-Cortez is a twenty-four year old citizen of El Salvador. He has entered the United States without inspection on at least three occasions, allegedly in an effort to flee the civil war in his country. Following his first illegal entry, he was granted voluntary departure on March 20, 1980. Upon his second illegal entry, he was deported to El Salvador on April 24, 1981. Platero-Cortez did not apply for asylum at his second deportation hearing because he was ill and was not informed of the necessary procedures.

He last entered the United States by crossing the Mexican border without inspection on or about July 31, 1981. An order to show cause why he should not be deported was issued on June 4, 1981. Platero-Cortez conceded deportability and applied for political asylum, prohibition against deportation,[1] and voluntary departure.[2]

---

1. In accordance with its regulations, 8 C.F.R. § 208.3(b) (1985), the Immigration and Natural-

2. See note 2 on page 1129.

A deportation hearing before the IJ was held on November 22, 1982. Platero-Cortez testified that he had been detained by the El Salvadoran National Guard in 1978, but he subsequently was released because one of the soldiers who detained him was acquainted with him and his family. He stated that in April 1981 he was taken off a bus, detained, and tortured by the El Salvadoran treasury police. He was released when a group of women with children passed by. Plateros-Cortez further testified that his employer and six of his co-workers had either "disappeared" or had been killed by the National Guard.

In further support of his asylum application, witness "John Doe" (Doe)[3] appeared on behalf of Platero-Cortez. The witness, a citizen of El Salvador, was an agent in the intelligence and security section of the National Guard. He testified that he had detained El Salvadoran citizens, interrogated them, searched their houses, and participated in the execution of approximately forty individuals suspected of leftist political affiliations. Doe stated that he had seen Platero-Cortez' name on the "death list" of the National Guard both in 1978 and 1981. The witness testified that Platero-Cortez' name appeared on these death lists because he was suspected of being a subversive and one of his sisters participated in an El Salvadoran coffee labor union, believed to be part of the leftist movement. Doe also testified that he was supposed to execute Platero-Cortez because his name appeared on the death list, but did not do so because he knew Platero-Cortez and his family. The witness further stated that those El Salvadorans who were deported from the United States would be met by soldiers at the airport upon return to El Salvador, their names would be put on a death list, and those persons on the list would be killed.

A second witness, James Oines, pastor of a Lutheran Church in Phoenix, Arizona, testified that he had been to El Salvador on two occasions. Upon arriving at the airport in El Salvador, he observed some of the El Salvadoran passengers being singled out and detained by soldiers. He also stated that he had heard about human rights violations and about the existence of death lists.

Platero-Cortez also submitted additional documents on appeal to the BIA, including a supplemental statement in which he stated that he had been arrested and tortured by the treasury police in April 1981, and an affidavit of his mother in which she stated that Platero-Cortez had been detained and tortured by the treasury police. His mother also stated that after Platero-Cortez left El Salvador the police searched the family dwelling five times.

Pursuant to 8 C.F.R. § 208.10, the Bureau of Human Rights and Humanitarian Affairs of the United States Department of State, submitted an advisory opinion finding that Platero-Cortez failed to establish a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

On November 24, 1982, the IJ concluded that Platero-Cortez failed to show he had been persecuted in El Salvador or that he would be subject to persecution upon returning to El Salvador. The IJ also found the testimony of John Doe incredible because of the atrocities he committed while in the National Guard and his friendship with Platero-Cortez. On November 24, 1982, the IJ denied Platero-Cortez' application and ordered him deported.

On August 21, 1985, the BIA dismissed Platero-Cortez' appeal. The BIA found that Platero-Cortez' testimony was not "detailed and consistent as it should be" to

ization Service (I & NS) treated the asylum application as also constituting a request for prohibition against deportation under section 243(h) of the Immigration and Nationality Act, 8 U.S.C. § 1253(h) (1985).

**2.** Platero-Cortez does not contest the denial of voluntary departure.

**3.** The witness was given an assumed name at the hearing to protect his identity.

support his claim. The BIA rejected the IJ's finding that Doe was incredible because of the atrocities he committed. It did, however, determine Doe was incredible because of his alleged friendship with Platero-Cortez.

## II.

## ANALYSIS

The government has the burden of proving that an alien is deportable. If the alien concedes deportability, however, as Platero-Cortez did in this case, the government's burden is satisfied. *Estrada v. INS*, 775 F.2d 1018, 1020 (9th Cir.1985).

### A. *Prohibition Against Deportation*

Pursuant to section 243(h) of the Immigration and Nationality Act, 8 U.S.C. § 1253(h), the Attorney General is prohibited from deporting an alien to a country if the alien's life or freedom would be threatened in that country "on account of race, religion, nationality, membership in a particular social group, or political opinion." *See INS v. Stevic*, 467 U.S. 407, 421 n. 15, 104 S.Ct. 2489, 2496 n. 15, 81 L.Ed.2d 321 (1984); *Bolanos-Hernandez v. INS*, 767 F.2d 1277, 1281 (9th Cir.1984).

■ The Supreme Court has held that to be eligible for prohibition against deportation an alien must show a clear probability of persecution. This requires a showing that it is "more likely than not that the alien would be subject to persecution." *Stevic*, 467 U.S. at 424, 104 S.Ct. at 2498. The alien must present some specific evidence that (1) he or those similarly situated are at a greater risk than the general population and (2) that the threat to him is a serious one. *Bolanos-Hernandez*, 767 F.2d at 1284–85.

■ We review the record to determine if the BIA's denial of an application for prohibition against deportation is supported by substantial evidence. *Saballo-Cortez v. INS*, 761 F.2d 1259, 1262 (9th Cir.); *Bolanos-Hernandez*, 767 F.2d at 1282 n. 8.

We have stated that "mere assertions of possible fear" are insufficient to establish a clear probability of persecution. *Shoaee v. INS*, 704 F.2d 1079, 1084 (9th Cir.1983). There must be some factual support, some specific evidence, or some concrete evidence, to support the alien's claim that persecution likely would be directed toward him as an individual. *Id.; Espinoza-Martinez v. INS*, 754 F.2d 1536, 1540 (9th Cir. 1985). Each case is evaluated on its own merits to determine whether the alien offered sufficient factual support and concrete evidence to establish a clear probability of persecution. *See McMullen v. INS*, 658 F.2d 1312, 1317 (9th Cir.1981).

We consider the alien's testimony carefully because an alien seeking asylum is often limited in the evidence he can obtain to show proof of potential persecution. *See Zavala-Bonilla v. INS*, 730 F.2d 562, 567 (9th Cir.1984); *McMullen*, 658 F.2d at 1319. The alien's testimony may, of course, be discredited by inconsistent statements and by the witness's demeanor.

■ Platero-Cortez testified that he had been detained by the National Guard in 1978 the same year his name first appeared on the death list. He also testified that shortly after his deportation to El Salvador in April 1981, he was riding on a bus which was stopped by soldiers, he was the only passenger taken off the bus, and that he was taken to an office of the treasury police and tortured.

Witness John Doe testified that he had seen Platero-Cortez' name on a "death list" both in 1978 and 1981. Doe believed that Platero-Cortez' name appeared on these lists because he was a suspected subversive and because of his sister's activities in the coffee union. Platero-Cortez testified that his sister's house was under constant surveillance. Doe testified that he was ordered to execute Platero-Cortez, but did not do so only because he knew Platero-Cortez and his family. Finally, Doe testified that persons appearing on a death list would be executed.

As previously noted, the affidavit of Platero-Cortez' mother stated that Plate-

ro-Cortez had been kidnapped, threatened, and tortured by the treasury police and that, since 1979, when Platero-Cortez first entered the United States, her house had been searched on five occasions by soldiers in an effort to locate Plateros-Cortez. Finally, Platero-Cortez testified that his employer and six of his coworkers either had "disappeared" or had been killed by the National Guard.

Both the IJ and the BIA found inconsistencies in Platero-Cortez' testimony and determined that Doe was an incredible witness. The BIA and the IJ found that Platero-Cortez was uncertain about the date he left El Salvador and about the date he was deported from the United States. The BIA noted also that Platero-Cortez testified that his employer and his employer's son were killed in a car, but stated in his asylum application that they were killed at home. Both of these inconsistencies have little or no relevance to the merits of Platero-Cortez' claim. They do not refute his testimony that he was detained, threatened, tortured, and twice had his name placed on death lists.

The BIA and the IJ found Platero-Cortez' reason for failing to apply for asylum at his 1981 deportation hearing an "unconvincing excuse." We disagree. In addition to being ill at the time of the hearing, Platero-Cortez was not informed of the asylum application process and did not have an attorney or representative to assist him.[4] He also told the IJ at this deportation hearing that he feared for his life if deported to El Salvador. Although Platero-Cortez merely moved to a nearby town in 1978 after Doe informed him his name appeared on a death list, he remained in hiding until he left the country. While in hiding, he worked for his brother-in-law, a short distance from his house.

The BIA found that even if Platero-Cortez had been arrested by the treasury police, he failed to show that he was tortured because of his race, religion, nationality, membership in a political group, or political opinion. The IJ found that even if Platero-Cortez had been arrested, it was because of his involvement with a terrorist or guerrilla group. The IJ determined, however, that his release demonstrated that the police did not believe Platero-Cortez was a subversive. But Platero-Cortez testified that he was detained and tortured over a two-day period. This testimony was uncontroverted. When the IJ and the BIA have not made any findings regarding the petitioner's credibility, we presume they have found the petitioner's testimony credible. *Canjura-Flores v. INS*, 784 F.2d 885, 889 (9th Cir.1985). Platero-Cortez' evidence that he was the only person taken off the bus, that his sister was a known member of the labor movement, and that soldiers searched his mother's house on five separate occasions to find him, suggests that the authorities considered him a subversive. When the government exerts its military strength against an individual, absent any criminal activity or conduct, "the most reasonable presumption is that the government's actions are politically motivated." *Hernandez-Ortiz v. INS*, 777 F.2d 509, 516 (9th Cir.1985).

Platero-Cortez' evidence rises to the degree of probability of persecution we have held to be sufficient for prohibition against deportation in other cases. *See, e.g., Argueta v. INS*, 759 F.2d 1395, 1397 (9th Cir.1985) (petitioner showed that direct threats had been made against him and that his brother-in-law had been tortured and killed by the same persons who threatened petitioner); *Bolanos-Hernandez*, 767 F.2d at 1280 (petitioner, a former member of a right-wing political party, was threatened by guerrillas after he refused to join them; similar tactics had been used to recruit petitioner's brother and the guerrillas had killed five of petitioner's friends). Substantial evidence does not support the

---

**4.** Q. Did anyone offer to help you fill out the asylum forms?
A. There was no one.
Q. Did you try to fill out the forms yourself?

A. No, I didn't know anything, I didn't know what to do. I didn't try because I didn't know how.

BIA's finding that Platero-Cortez failed to establish a clear probability of persecution.

### B. *Political Asylum*

■ Eligibility for political asylum under section 208(a) of the Refugee Act of 1980, 8 U.S.C. § 1158(a) (1982), requires the alien to show that he qualifies as a "refugee" within the meaning of 8 U.S.C. § 1101(a)(42)(A) (1982), which defines refugee as:

> any person who is outside any country of such person's nationality ... who ... is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. . . .

The Supreme Court recently granted certiorari in *Cardoza-Fonseca v. INS*, 767 F.2d 1448 (9th Cir.1985), *cert. granted,* — U.S. ——, 106 S.Ct. 1181, 89 L.Ed.2d 298 (1986), to determine whether the well-founded fear standard is more generous than, or the same as, the clear probability standard. We have concluded that Platero-Cortez established a clear probability of persecution. Therefore, the ultimate decision in *Cardoza-Fonseca* will not affect our conclusion that Platero-Cortez has necessarily met the well-founded fear standard sufficient to support his asylum application.

Since only a grant of asylum automatically permits an alien to apply for permanent resident status after one year, 8 U.S.C. § 1159(b), Platero-Cortez may wish to be granted asylum in addition to prohibition against deportation. We remand Platero-Cortez' asylum claim to the Attorney General so that he may exercise his discretion. *See* 8 U.S.C. § 1158(a); *Bolanos-Hernandez,* 767 F.2d at 1282.

### C. *Application of the Proper Legal Standard*

Platero-Cortez argues that the IJ failed to distinguish properly between the two applicable legal standards and that the BIA applied an incorrect standard to his asylum application. We need not reach this question. As stated above, because we hold that Platero-Cortez has established a clear probability of persecution, he meets the well-founded fear standard. Thus, any error by the BIA was harmless.

### D. *Due Process Claims*

We need not decide Platero-Cortez' due process claims since the BIA reviewed his application de novo and made its own factual findings. We will not disturb the BIA's decision so long as the proceeding was not "so fundamentally unfair that the alien was prevented from reasonably presenting his case." *Lopez v. INS,* 775 F.2d 1015, 1017 (9th Cir.1985) (citing *Paul v. INS,* 521 F.2d 194, 198–99 (5th Cir.1975)). The BIA undertook a de novo review, received evidence, and made its own factual findings in a detailed, ten-page decision. Plateros-Cortez was not prevented from reasonably presenting his case to the BIA.

### III.

### CONCLUSION

Platero-Cortez has introduced specific evidence that his life has been threatened because the government authorities believe he is a subversive. Because he has been tortured he has shown that this threat is a serious one. The BIA's decision is not supported by substantial evidence. There is a clear probability that Platero-Cortez would be subject to political persecution if he returns to El Salvador. Therefore, Platero-Cortez also meets the eligibility requirements for a grant of asylum. The petitioner's due process claims, however, are without merit.

AFFIRMED IN PART, REVERSED AND REMANDED IN PART.